**SEALED**

1
2
3
4
5
6

William R. Barzee (FLBN 0158720)
Williambarzee@barzeeflores.com
LAW OFFICES OF WILLIAM R. BARZEE, P.A.
40 N.W. 3rd Street, PH1
Miami, FL 33128
Telephone: (305) 374-3998
Facsimile: (305) 374-3985
Attorneys for Plaintiff-Relator,
RELATOR LLC

FILED BY _____ D.C.

FEB 1 4 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

7
8
9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<div style="left column">

**UNITED STATES OF AMERICA,**

    Plaintiff,

*ex rel.* **RELATOR LLC**, a California
limited liability company,

    Relator,

    v.

**MATTHEW BROWN,** an individual;
**BARRY BROWN,** an individual; and
**TEE OFF TEMPS, INC**, a Florida
Corporation, and DOES 1-10,

    Defendants.

</div>

Case No.

**COMPLAINT FOR VIOLATIONS
OF FEDERAL FALSE CLAIMS
ACT**

**FILED *IN CAMERA* UNDER SEAL
PURSUANT TO 31 U.S.C. §
3730(b)(2)**

**DO NOT PLACE ON PACER**

**JURY TRIAL DEMANDED**

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

COMPLAINT

Plaintiff RELATOR LLC ("Plaintiff") complains of **MATTHEW BROWN**, an individual, **BARRY BROWN**, an individual, **TEE OFF TEMPS, INC** ("TEE"), a Florida Corporation, and DOES 1-10.

## JURISDICTION & VENUE

1.      This Court has subject matter jurisdiction over the Plaintiff's claims brought under the FCA, 31 U.S.C. §§ 3279, et seq., pursuant to 31 U.S.C. §§ 3730 and 3732. This Court has supplemental jurisdiction to entertain the common law and equitable causes of action under 28 U.S.C. § 1367(a).

2.      Plaintiff The United States of America is also located in the Southern District of Florida. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at all times material hereto, Defendants transacted business and are located in the Southern District of Florida, and acts proscribed by 31 U.S.C. § 3729 occurred in this district.[1]

3.      Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because the Defendant's acts that form the basis of this Complaint occurred in the Southern District of Florida.

4.      Relator's claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from the news media. To the extent that there has been a public disclosure unknown to Relator, it is the "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B) and/or the public disclosure is a result of Relator voluntarily providing this information to the United States Government prior to filing this *qui tam* action.

---

[1] TEE operates throughout Florida, and has its headquarters in Stuart, Florida, in the Southern District of Florida.

CYPRESS LLP
11111 Santa Monica Boulevard Suite 660
Los Angeles, California 90025
(424) 901-0123

**INTRODUCTION AND SUMMARY**

5.     In this matter the founders and executives of a golf course staffing agency used their golf course staffing business to misappropriate millions of dollars from the US Federal government's Paycheck Protection Program ("PPP"). In order to obtain the loan, the Defendants presented many falsified loan documents to the SBA. Defendants made false statements to obtain more than the amounts permitted under the program, and falsified the number of employees on payroll. Defendants did not have any economic need for the loan, they simply took advantage. Defendants had no economic need for payroll assistance, assuming the loan was used on payroll. Defendants falsified additional documents which were presented to the government to obtain total loan forgiveness, billing millions to the US taxpayer.

6.     Matthew Brown and Barry Brown used their golf course staffing agency business, TEE Off Temps, Inc, to apply for and receive a PPP loan totaling **$9,350,000.00**, purportedly to cover payroll costs. However, TEE and its owners Matthew Brown and Barry Brown:

a.  Falsified business type or industry;

b.  Falsified number of jobs;

c.  Falsified loan eligibility;

d.  Falsified the use of the loans on authorized expenses;

e.  Falsified the economic necessity for the loans; and

f.  Falsified eligibility for loan forgiveness.

7.     <u>Falsified Business Type or Industry</u>. In their PPP loan application, the Defendants falsified the industry in which their business belongs. The Defendants reported on their application that the business operated under NAICS Code 561730, "Landscaping Services", in order to hide their industry to avoid being specifically prohibited from applying for various reasons. Examples of businesses that fall under the NAICS Code 561730, "Landscaping Services" category are "fertilizing

CYPRESS LLP
11111 Santa Monica Boulevard Suite 800
Los Angeles, California 90026
(424) 901-0123

COMPLAINT

1    lawns, landscaping services, and lawn care services." Clearly, Defendant's business
2    does not fall within this category. Rather, Defendants' business is better classified
3    under NAICS Code 561320 for "Temporary Help Services." It is highly improbable
4    that a company would not understand the type of business they are in. It is even
5    more improbable that they would not know what industry they are in. These are
6    among the most fundamental questions for any company. Taken by itself, the false
7    reporting of these fundamental matters are a big misrepresentation, and no small lie.
8    Such a major misreporting is hard to believe inadvertent or innocent and is a
9    concerning indication of that other incorrect information is also being provided,
10   even when taken by itself. However, taken in the context of the other information
11   provided which has been confirmed to be dishonest, the misstatements regarding
12   industry and business type are obviously nefarious. This type of misstatement, a
13   fundamental one, is also evidence of a larger scheme to deceive the government. It
14   is part of a greater deception. It is evident that the Defendants understood they were
15   involved in fraud and orchestrated its various components deliberately. This is no
16   small deceit, but a big plan to take a large amount of money which they knew was
17   ill-gotten.

18        8.    <u>Falsified Number of Jobs Reported</u>. TEE claimed to have exactly 500
19   employees, which is not coincidentally the maximum number of employees that a
20   borrower could have under the PPP and CARES Act in order to qualify for a PPP
21   loan. Pursuant to any reasonable interpretation of TEE's employee number
22   calculation, it is clear that TEE's statement that it had exactly 500 employees is
23   false. TEE falsely reported the maximum number of employees as being "500",
24   which just so happens to be the maximum number of employees allowed for
25   eligibility. 500 is the limit. Beyond this 500 number lies complete ineligibility. It is
26   an all or nothing analysis. If they had even a single more job, it would make them
27   ineligible for a loan for any amount altogether. So, in order to cheat the maximum
28   500 rule, they falsely reported the number of jobs as 500 exactly. As set forth

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

4
COMPLAINT

1    above, TEE's inclusion of workers that it brokered as "employees" was fraudulent,

2    since the workers' salaries were guaranteed to be paid by the client-business. On

3    the other hand, should TEE be permitted to count these workers as "employees"

4    TEE would have thousands of so-called employees, which would also render its

5    statement that it had 500 employees false, and which would also make it ineligible

6    to receive a PPP loan. They also applied for the near maximum loan amount

7    allowed, $9,350,000.00. In falsely claiming they had exactly 500 employees, TEE

8    claimed to have the maximum number of employees allowable to be eligible for a

9    PPP loan, while maximizing the amount they could get. TEE's own LinkedIn page

10   shows that the company has only 5 employees. Additionally, ZoomInfo shows that

11   TEE employs less than 25 people. The defendants grossly exaggerated and falsely

12   stated the number of employees that they had in order to maximize the amount of

13   loan proceeds that they misappropriated from the government.

14        9.   Defendants' Business Model – Double Dipping and No Economic

15   Necessity. Staffing agencies, like TEE, are not the end user of the workers that they

16   handle, rather they are the middle-men and brokers of such workers. A staffing

17   agency's client is the business that needs the employees that the staffing agency

18   brokers. Outside of a small internal administrative staff, TEE, like most other

19   staffing agencies does not keep the workers that they broker as employees on their

20   payroll. Rather, it is only when a client-business needs a worker that TEE steps in

21   and brokers a temporary employment transaction. This means that every single time

22   TEE brokers a worker in this manner, someone else (the client-business) is actually

23   paying the worker's salary, and TEE, as the middle-man, just takes a cut of that

24   pay. So, for every single one of the 500 employees that TEE received PPP money

25   (outside of its very small number of internal administrative staff) this necessarily

26   means that TEE was paid twice, once by the client-business, next by the US

27   taxpayers. This also means that there was absolutely no economic necessity,

28   because TEE was never obligated to pay a salary to any of these workers to

COMPLAINT

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

1  maintain its operations, since the only way that TEE's business model requires
2  payment to these workers is when TEE has brokered a deal for their services.
3  Plainly put, TEE would not pay the workers not to work. If they ever worked,
4  someone else would pay. The PPP was made to help struggling businesses which
5  were unsure about being able to pay their workers. The second certification in the
6  application was: "Current economic uncertainty makes this loan request necessary
7  to support the ongoing operations of the Applicant." The word "necessary" is
8  important. The SBA required that the COVID pandemic caused enough economic
9  uncertainty such that company payroll was jeopardized. That is a distinct standard.
10 It is not enough that there was economic uncertainty. The uncertainty must be dire
11 enough to threaten payroll. There must be sufficient economic uncertainty, such
12 that the company's engine room and most important asset, its people, were
13 threatened with economic troubles. In other words, the business must be on life
14 support. The business must have been in trouble to the point where its most
15 important resource, its people, were not affordable any longer. The PPP was not a
16 free excuse to raid government coffers by wealthy businessmen. TEE did not need
17 the loans -- there was no "need" or "economic necessity" to pay Defendant's
18 payroll expenses.  TEE did not and cannot show any decline in revenue during the
19 pandemic, much less a decline so bad it threatened worker pay. Yet Defendants
20 falsely certified they had "economic uncertainty" so they could take financial
21 assistance from the US taxpayer.

22        10.    Golf Staffing Agencies: Flourishing Amidst the COVID-19 Pandemic
23 – No Economic Necessity. It was evident from the onset of the pandemic that Golf
24 staffing agencies, like the Defendant, would thrive financially during the pandemic,
25 and therefore TEE could not in good faith make the Economic Necessity
26 Certification. This was evident for a number of reasons at the onset of the
27 pandemic, including, the clear surge in interest and participation golf courses
28 experienced during the pandemic, demand for golf course professionals, their

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

1  ability to rapidly deploy golf course professionals and scale their business, and
2  increased rates and profitability. Golf was considered a relatively safe outdoor
3  activity that allowed for social distancing, which appealed to individuals seeking
4  recreational options during lockdowns or restrictions. With more people taking up
5  golf or returning to the sport, golf courses saw an increase in rounds played and
6  related revenues. Golf clubs reported an uptick in membership inquiries and new
7  sign-ups during the pandemic. According to the National Golf Foundation, there
8  were 24.8 million golfers in 2020, which is an increase of 500,000 golfers over
9  2019. The heightened demand for tee times and golf equipment sales contributed to
10  a demand for skilled workers to operate the courses and club houses. Golf staffing
11  agencies, like TEE, with their vast industry knowledge knew better than others that
12  this would be the case, and that with their vast networks of qualified professionals,
13  they could and did quickly position themselves to meet this surge in demand. By
14  providing the golf industry with access to a diverse pool of golf course workers,
15  these agencies, like TEE, *immediately* became indispensable in the functionality of
16  this popular recreational activity, thereby ensuring their financial prosperity. It was
17  immediately clear to TEE that they had become an indispensable and much more
18  profitable long before they submitted their PPP loan application. The operators of
19  TEE knew that their business would benefit from the pandemic. Golf was one of the
20  only industries in Florida that was allowed to continue to operate by the Florida
21  state government and was not forced to close. Golf clubs received favorable
22  treatment, which was publicly known, while at the same time the state government
23  forced the closure of restaurants, bars, nightclubs, state parks, fitness centers boat
24  ramps etc. The ability of TEE to rapidly deploy personnel was a key factor in its
25  financial triumph during the pandemic. With streamlined recruitment processes and
26  an extensive database of qualified professionals, TEE could promptly fill staffing
27  gaps in golf course facilities. Whether it was the temporary deployment of
28  landscaping technicians to overwhelmed golf courses or the recruitment of lawn

7
COMPLAINT

maintenance professionals on a year-round basis, golf course staffing agencies, like TEE, obtained a windfall in exploiting the demand for golf course maintenance. This swift and efficient deployment model allowed them to attract more contracts and generate substantial revenues throughout the pandemic. The surge in demand for golf course personnel during the COVID-19 crisis gave rise to increased rates for these services. Plaintiff is informed and believes that golf course staffing agencies, like TEE, capitalized on this opportunity by negotiating higher compensation rates for their golf course professionals. Moreover, with the need for specialized staff reaching critical levels, agencies could charge premium rates for scarce specialties, further boosting their profitability. The combination of heightened demand, increased rates, and efficient deployment strategies resulted in substantial financial gains for golf course staffing agencies, like TEE. The success of golf course staffing agencies, like TEE, during the COVID-19 pandemic was both predictable and impressive.

11. <u>Falsified Use of Loan Proceeds on Authorized Expenses.</u> On its application, TEE claimed that 100% of the loan proceeds would be used for salaries. TEE claimed to have 500 employees, when, in truth, only a small number of those 500 employees were internal administrative staff, and the vast majority of the rest, were workers that TEE brokered to end user, client businesses. Therefore, when TEE certified that the PPP loan proceeds would be used for the salaries of such workers, that certification was false. Specifically, those workers' salaries were being paid by end user, business-clients of TEE and TEE simply used the PPP proceeds to increase its profits.

12. <u>Money Not Returned.</u> The loan was taken by a business which was not allowed to take even one penny in loans, let alone millions of dollars. The **$9,350,000.00** in funds should have been returned immediately. These loans should never have been sought in the first place. Yet the Defendants went further by obtaining total loan forgiveness, billing the US taxpayers millions of dollars.

*Defendants have not returned the loan proceeds.*

13.   <u>Further Falsification on Loan Forgiveness</u>. Defendants falsified further documents to receive loan forgiveness. Defendants had to attest as to the use of the funds and the amount used on authorized purposes. They were not because Defendants could not comply with the requirements of forgiveness given their ineligibility, exorbitant amounts borrowed and false statements regarding numbers of employees. So, Defendants also lied on their forgiveness documents and application.

14.   <u>Defendant's False Statements and Fraud</u>. Defendants knowingly and intentionally made many materially false statements to the government and bank to obtain the loans.

15.   Plaintiff brings this action as relator on behalf of the United States to recover treble damages, civil penalties, and costs under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33 Plaintiff gave notice of its intent to file and full disclosure of the evidentiary basis to the Department of Justice ("DOJ").

**THE PARTIES**

16.   Plaintiff is a California limited liability company with its principal place of business in Los Angeles, California.

17.   Defendant Matthew Brown is an individual and, at all relevant times herein, is and was a Founder and President of TEE.

18.   Defendant Barry Brown is an individual and, at all relevant times herein, is and was a Founder and Vice President of TEE.

19.   Defendant TEE Off Temps, Inc is a Florida Corporation formed in 1999 with its principal place of business located at 3180 SE Slater St., Stuart, Florida 34997.

20.   The true names and capacities, whether individual, partner, associate, corporate or otherwise, of Defendant DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiff, who therefore sues said Defendant(s) by such

CYPRESS LLP
11111 Santa Monica Boulevard Suite 600
Los Angeles, California 90025
(424) 901-0123

fictitious names.  Plaintiff is informed and believes and thereon alleges that each Defendant designated herein as a "DOE" is legally responsible in some manner for the events and happenings herein mentioned.  Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of said DOES, and add appropriate charging allegations against said DOES when their identities have been ascertained.  Plaintiff is informed and believes that each of the DOE Defendants were responsible in some manner for the injuries and damages alleged herein, and/or for the wrongful acts of some or all of the Defendants.

21.    Plaintiff is further informed and believes that each of the Defendants, whether specifically named or named as a DOE, was an agent, employee, servant and/or representative of each of the remaining Defendants, and, in doing or failing to do the things alleged herein, was acting within the course and scope of said agency, employment, service and/or representation.

22.    Plaintiff is further informed and believes that each of the Defendants, whether specifically named herein or named as a DOE, approved, ratified and/or acquiesced in the acts and omissions of each of the remaining Defendants.

23.    Plaintiff is further informed and believes that each of the Defendants herein, whether named as DOES or otherwise, acted in concert, agreement and conspiracy with the other Defendants for the common purpose of engaging in a scheme to defraud as alleged below.

**THE CARES ACT AND PAYCHECK PROTECTION PROGRAM**

24.    On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act" or "the Act") (Pub. L. 116-136) became law and provided emergency assistance and health care response for eligible individuals, families, and businesses affected by the coronavirus pandemic. SBA received funding and authority through the Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

1    25.    The CARES Act authorized loans to eligible small businesses

2    struggling to pay employees and stay in business as a result of the devastating effect

3    of the COVID-19 pandemic and resulting restrictions.

4    26.    Section 1102 of the CARES Act temporarily permitted the SBA to

5    guarantee 100 percent of 7(a) loans under a new program titled the "Paycheck

6    Protection Program" ("PPP").

7    27.    On April 24, 2020, the Paycheck Protection Program and Health Care

8    Enhancement Act (Pub. L. 116-139) was enacted to provide additional funding and

9    authority for the PPP. On June 5, 2020, the PPP Flexibility Act of 2020 (Flexibility

10   Act) (Pub. L. 116-142) was enacted, changing key provisions of the PPP, including

11   provisions relating to the maturity of PPP loans, the deferral of PPP loan payments,

12   and the forgiveness of PPP loans.

13   28.    Under the PPP, in 2020, eligible businesses could obtain one SBA

14   guaranteed PPP loan. Businesses were required to spend all loan proceeds only for

15   employee compensation, rent or mortgage, and certain other specified expenses.

16   Depending on their use of the loan proceeds as certified, they could qualify for loan

17   forgiveness, up to the full amount of the loan.

18   29.    The SBA delegated authority to third-party lenders to underwrite and

19   approve the PPP loans. In order to obtain a PPP loan, whether a "First Draw" or

20   "Second Draw" loan, an eligible business (through its authorized representative)

21   had to sign and submit a PPP loan application (SBA Form 2483) online through the

22   lender's platform. The PPP loan application (SBA Form 2483) required the

23   business (through its representative) to acknowledge the PPP program rules and

24   make certain certifications in order to be eligible to obtain the PPP loan, including

25   certifying that their certifications were true.

26   30.    Once the Borrower submitted its PPP loan application (SBA Form

27   2483) to a Lender, the participating lender processed the PPP loan application. If a

28   PPP loan application (SBA Form 2483) was approved by the lender, it funded the

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

COMPLAINT

1     PPP loan with its own funds, which were 100% guaranteed by the SBA.

2          31.     After the Lender processed and approved a borrower's PPP loan

3     application (Form 2483), but prior to the closing of the PPP loan, the Lender

4     submitted to the SBA, the Lender's Application - Paycheck Protection Program

5     Loan Guaranty (SBA Form 2484) to the SBA applying for a guarantee on the loan.

6     For a PPP loan to be approved, the Lender was required to Answer Yes to the

7     following questions in the Lender's Application - Paycheck Protection Program

8

9     Loan Guaranty (SBA Form 2484) as to the Borrower's certification of its General

10     Eligibility to receive a PPP Loan:

| | |
|---|---|
| • The Applicant has certified to the Lender that (1) it was in operation on February 15, 2020, has not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees or had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099MISC; (2) current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant; (3) the funds will be used to retain workers and maintain payroll, or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures; and (4) the Applicant has not and will not receive another loan under the Paycheck Protection Program, section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)) (this does not include Paycheck Protection Program second draw loans, section 7(a)(37) of the Small Business Act (15 U.S.C. 636(a)(37)). | ☐ Yes    ☐ No |

27      SBA Form 2484 (emphasis added). Therefore, if a PPP borrower lied on its

28     PPP loan application (SBA Form 2483), the PPP borrower's false certification

COMPLAINT

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 501-0123

1   caused the Lender to submit to the SBA with respect to that PPP Loan, a Lender's

2   Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) that

3   contained the PPP borrower's False Statement.

4         32.    SBA Form 2483 includes the following certification, among others: "I

5   have read the statements included in this form, including the Statements Required

6   by Law and Executive Orders, and I understand them" (the "Understanding

7   Certification").

8         33.    SBA Form 2483 also includes the following certification, among

9   others: "The Applicant is eligible to receive a loan under the rules in effect at the

10  time this application is submitted that have been issued by the Small Business

11  Administration (SBA) implementing the Paycheck Protection Program under

12  Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act

13  (CARES Act) (the Paycheck Protection Program Rule)" (the "Eligibility

14  Certification").

15        34.    SBA Form 2483 also includes the following certification, among

16  others: "The Applicant (1) is an independent contractor, eligible self-employed

17  individual, or sole proprietor or (2) employs no more than the greater of 500 or

18  employees or, if applicable, the size standard in number of employees established

19  by the SBA in 13 C.F.R. 121.201 for the Applicant's industry" (the "Size

20  Certification").

21        35.    SBA Form 2483 also includes the following certification, among

22  others "All SBA loan proceeds will be used only for business-related purposes as

23  specified in the loan application and consistent with the Paycheck Protection

24  Program Rule" (the "Use of Proceeds Certification").

25        36.    SBA Form 2483 also includes the following certification, among

26  others: "Current economic uncertainty makes this loan request necessary to support

27  the ongoing operations of the Applicant" (the "Economic Necessity Certification").

28        37.    SBA Form 2483 also includes the following certification, among

CYPRESS LLP
11111 Santa Monica Boulevard Suite 600
Los Angeles, California 90025
(424) 901-0123

others: "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud" (the "Worker Retention and Payroll Certification").

38.    SBA Form 2483 also includes the following certification, among others: "During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program" (the "Single Loan Certification").

39.    SBA Form 2483 also includes the following certification, among others: "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000" (the "No False Statements Certification").

40.    After the borrower submitted a PPP loan application, it was processed by the participating lender. If the PPP loan application was approved, the participating lender funded the loan using its own monies, which were then guaranteed by the SBA. Generally, in the event the borrower defaulted on a PPP loan, the SBA would purchase the borrower's debt from the lender and be responsible for its repayment.

41.    Under applicable SBA rules and guidance, recipients of PPP loans could apply to have principal and interest on the PPP loan fully forgiven, meaning

COMPLAINT

that the borrower would owe nothing and would have no obligation to repay the PPP loan. To obtain full forgiveness of the PPP loan, borrowers had to attest that they had "not reduced the number of employees or the average paid hours of [their] employees" during the loan period, that the loan proceeds had been spent on payroll costs and other permitted expenses and that at least 60% of the loan proceeds had been spent on payroll costs (hereafter the "Loan Forgiveness Certification").

42.     Loans could only be used for certain permitted expenses, such as to pay employees' salaries, employee benefits, mortgage interest, rent, utilities or worker protection costs related to COVID19.

43.     More specifically, the loan forgiveness application (SBA Form 3508), revised as of July 30, 2021, included the following certifications, among others:

(1)     The dollar amount for which forgiveness is requested:

- was used to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments);

- includes all applicable reductions due to decreases in the number of full-time equivalent employees and salary/hourly wage reductions;

- includes payroll costs equal to at least 60% of the forgiveness amount;

- if a 24-week Covered Period applies, does not exceed 2.5 months' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $20,833 per individual; and

- if the Borrower has elected an 8-week Covered Period, does not exceed 8 weeks' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $15,385 per individual.

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

15

(2)     I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges.

(3)     The Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness.

(4)     The Borrower's eligibility for loan forgiveness will be evaluated in accordance with the PPP regulations and guidance issued by SBA through the date of this application.

## DEFENDANTS' FRAUD

44.     During round 1 of the PPP, Defendant TEE applied for a PPP loan for **$9,350,000.00**. It was approved on April 29, 2020, by the SBA for the full amount, which was disbursed. The loan was facilitated by Sterling National Bank. Defendant received 100% of the approved amount. On its application for this loan, Defendant stated that it had exactly 500 employees for which it needed the loan. This loan was forgiven on July 29, 2021.

45.     As a golf course staffing agency, TEE serves as a middleman between workers seeking part-time employment and businesses that need part-time employees. When TEE places a worker at a business, the business then pays the worker's wages directly to TEE, who then takes a cut of that pay and then pays the worker. TEE only has a small, internal administrative staff of recruiters and placement agents who are on their payroll (the "Payroll Staff"). TEE does not have any payment or employment obligation to the vast number of other workers on TEE's roster who are not part of the Payroll Staff, and is only ever obligated to pay these other workers when they have been placed at a client business. When these non-Payroll Staff are placed at a client business, the client business pays these workers' wages. In other words, TEE is only required to pay these non-Payroll

16

COMPLAINT

1    Staff workers when someone else is paying them.

2        46.    Matthew Brown and Barry Brown who founded TEE in 1999 new

3    their business model well when they applied for the PPP Loan. They knew that if

4    they took a PPP loan for non-Payroll Staff that they would be paid twice for each

5    such employee, once from the client business and once from the PPP proceeds. The

6    Browns knew that they would be double-dipping each and every time and that the

7    proceeds of the PPP loan would only be used to pad their profits. They knew that

8    they were under no obligation to pay most of their employees, and certainly none of

9    their non-Payroll Staff. They knew that because of this double-dipping business

10   model and the low overhead created by a lack of obligation to pay non-Payroll Staff

11   that there was no economic necessity for the business to sustain TEE's operations.

12   They understood that the proceeds of the PPP loan would simply just pad their

13   profits. Therefore, when Defendants made the Economic Necessity Certification,

14   the certification was false.

15       47.    Matthew Brown and Barry Brown, as veterans of the golf course

16   staffing agency industry, knew that the COVID-19 pandemic presented a unique

17   opportunity for TEE to make much more money than in the absence of the

18   pandemic. As industry veterans they knew that TEE would experience an economic

19   boon during a health crisis necessitating social distancing. The Browns, like most

20   residents of Florida, knew that the State of Florida allowed golf courses to remain

21   open, even though the State of Florida forced many other businesses, like

22   restaurants, gyms and bars, to shut down during the pandemic. As the beneficiaries

23   of an industry that obtained significant favorable treatment and boomed during the

24   pandemic, the Browns knew that the Economic Necessity Certification was false

25   when they made it.

26       48.    Matthew Brown and Barry Brown also knew when they claimed that

27   they had 500 employees that such a statement was false. First, TEE did not have

28   exactly 500 employees, and TEE inflated its numbers to include non-Payroll Staff

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 391-0123

1    and therefore to double-dip and pad corporate profits with PPP proceeds.

2        49.    In addition to applying any applicable business type ineligibility rules,

3    all borrowers should carefully review the required Economic Necessity

4    Certification on the Borrower Application Form stating that ''[c]urrent economic

5    uncertainty makes this loan request necessary to support the ongoing operations of

6    the Applicant.''

7        50.    TEE abused the PPP program, from misrepresenting its economic need

8    for the loan to willfully ignoring its ineligibility, to maximizing the amount of the

9    loan and then obtaining loan forgiveness. Discovery will reveal where the millions

10   in PPP funds were actually spent, but what is obvious is that Defendants *did not*

11   *need any money from US taxpayers*. The business model necessarily meant that

12   TEE would be paid by others for people it employed and therefore did not need

13   money from US taxpayer to pad its profits. TEE is and was highly profitable during

14   the pandemic, just like most in their industry. TEE did not suffer any business loss

15   and certainly had the money to pay their own worker wages.

16       51.    Defendants signed the loan applications, thereby endorsing the

17   Understanding Certification, which means that they agreed that they understood the

18   rules and guidelines of the PPP, including, without limitation the rules regarding

19   use of proceeds and the certifications made.

20       52.    The proceeds of the PPP Loans were not and could not have been used

21   only for authorized purposes consistent with the PPP Rule, because, among other

22   things, the Defendants were obviously not allowed to take PPP loans, in the amount

23   received, because of their size and double-dipping business model. Therefore, when

24   Defendants made the Use of Proceeds Certification, the certification was false.

25       53.    The PPP loan money was only allowed to be used on authorized

26   expenses. The proceeds of the PPP Loan were not needed to retain workers and

27   maintain payroll for non-Payroll Staff who were necessarily being paid by TEE's

28   client businesses, therefore when Defendant made the Worker Retention and

CYPRESS LLP
11111 Santa Monica Boulevard Suite 500
Los Angeles, California 90025
(424) 901-0123

COMPLAINT

1   Payroll Certification, the certification was false.

2       54.   By virtue of the above false statements, when Defendants made the No

3   False Statements Certification, that certification was false.

4       55.   The Defendants actively pursued and obtained loan forgiveness.

5   Because TEE is prohibited from obtaining any PPP loans, its representation on its

6   forgiveness application that it spent 100% of the loan proceeds on eligible expenses

7   was not truthful. The SBA would not have forgiven the loans if they knew

8   Defendants' certifications described above were false. They also would not have

9   forgiven the loans if they knew the proceeds had been used to increase profits

10  instead of paying their employees.

11      56.   As a result of the forgiveness, Defendants have not repaid the loan and

12  have kept the proceeds, and the loan has been repaid with money from taxpayers,

13  including the small businesses and owners who were supposed to receive the PPP

14  funds instead of repaying a profitable golf course staffing company's loan that it

15  never should have received, let alone had forgiven.

16                          **THE FALSE CLAIMS ACT**

17      57.   The False Claims Act prohibits fraudulent conduct in connection with

18  federal programs, including the knowing submission of false claims for payment to

19  the government. See 31 U.S.C. § 3729(a)(1)(A). In these circumstances, liability

20  may attach if the omission renders those representations misleading. 41. 31 U.S.C.

21  § 3729(a)(1)(A) and (B) of the FCA provide that:

22              (1) . . . any person who—

23              (A) knowingly presents, or causes to be presented, a false or fraudulent

24  claim for payment or approval; [or]

25              (B) knowingly makes, uses, or causes to be made or used, a false

26  record or statement material to a false or fraudulent claim,

27              . . .

28              (G) knowingly makes, uses, or causes to be made or used, a false

CYPRESS LLP
11111 Santa Monica Boulevard Suite 600
Los Angeles, California 90025
(424) 901-0123

19

COMPLAINT

1    record or statement material to an obligation to pay or transmit money or property

2    to the Government, or knowingly conceals or knowingly and improperly avoids or

3    decreases an obligation to pay or transmit money or property to the Government, is

4    liable to the United States Government . . .

5           31 U.S.C. § 3729(a)(1)(A), (B), and (G) (2020).

6           42. The scope of a false or fraudulent claim is to be broadly construed.

7    As used in the FCA, a "claim"

8           (A) means any request or demand, whether under a contract or

9    otherwise, for money or property and whether or not the United States has title to

10   the money or property, that—

11          (i) is presented to an officer, employee, or agent of the United States;

12   or

13          (ii) is made to a contractor, grantee, or other recipient, if the money or

14   property is to be spent or used on the Government's behalf or to advance a

15   Government program or interest, and if the United States Government—

16          (I) provides or has provided any portion of the money or property

17   requested or demanded; or

18          (II) will reimburse such contractor, grantee, or other recipient for any

19   portion of the money or property which is requested or demanded; . . .

20          31 U.S.C. § 3729(b)(2) (2020).

21       58.    A person who violates the False Claims Act during the time period at

22   issue "is liable for a civil penalty as adjusted, plus 3 times the amount of damages

23   which the United States Government sustains because of the act of that person." 31

24   U.S.C. § 3729(a). See 28 C.F.R. § 85.3(a)(9); Department of Justice, 28 CFR Part

25   85, Civil Monetary Penalties Inflation Adjustments for 2022 published at:

26   https://www.govinfo.gov/content/pkg/FR-2022-05-09/COMMERCE/2022-

27   09928.COMMERCE.

28                          **FIRST CAUSE OF ACTION**

COMPLAINT

CYPRESS LLP
11111 Santa Monica Boulevard Suite 600
Los Angeles, California 90025
(424) 901-0123

**FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(A-B))**

59.     Plaintiff alleges and incorporates by reference each and every allegation contained in all prior paragraphs of this complaint.

60.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

61.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States government, false or fraudulent claims for payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(l)(A). Specifically, each of Defendants' Economic Necessity, No False Statements, Eligibility, Use of Proceeds, Understanding, Worker Retention and Payroll Certifications described above all were knowingly false, and relied upon by lenders and the SBA in approving the PPP Loans.  Their request for forgiveness contained a further misrepresentation that the loans had been used only for authorized purposes.

62.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

63.     The Government and its agents and contractors relied on those false statements in approving and making the loans and subsequently forgiving them, leaving the burden of repayment on taxpayers.

64.     Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $12,537.00 and not more than $25,076.00 for each and every violation arising from Defendants' unlawful conduct alleged herein, and attorneys' fees in an amount to be proven.

**CONCLUSION**

COMPLAINT

65.     Matthew Brown, Barry Brown, and their company abused the PPP. The PPP was meant for struggling businesses. Now that program is dry. The American people have a right to reconciliation.

## **PRAYER FOR RELIEF**

WHEREFORE, qui tam Plaintiff/Relator prays for judgment against Defendants, as follows:

1. That this Court enter judgment against each Defendant in an amount equal to three times the damages that the United States has sustained because of Defendants' action, plus a civil penalty of not less than $12,537.00 and not more than $25,076.00 for each and every false claim as are required by law, together with all such further relief as may be just and proper.

2. Such other relief as this Court may deem just and proper, together with interest and costs of this action.

3. Reasonable attorney fees, litigation expenses, and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 12, 2024          LAW OFFICES OF WILLIAM R. BARZEE, P.A.

By: _____

WILLIAM R. BARZEE
Attorneys for Plaintiff-Relator
RELATOR LLC

CYPRESS LLP
11111 Santa Monica Boulevard Suite 560
Los Angeles, California 90025
(424) 901-0123

COMPLAINT